WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY, Appellee,

v.

TWO PARCELS OF LAND IN FAIRFAX
COUNTY, VIRGINIA, Eugene Hooper,
Celeste Hooper, J. Willard Marriott,
Donna G. Marriott, Richard E. Marriott,
and Nancy Marriott, Appellants.

No. 76–1960.

United States Court of Appeals,
Fourth Circuit.

Argued April 6, 1977.

Decided Jan. 31, 1978.

J. Strouse Campbell, Arlington, Va. (Herrell, Campbell & Lawson, Arlington, Va.,

brief) and Robert C. Fitzgerald, Fairfax, Va. (David P. Bobzien, Frank C. Kimball, Fitzgerald & Smith, Fairfax, Va., on brief), for appellants.

Maryann Walsh, Atty., Dept. of Justice, Washington, D. C. (Peter R. Taft, Asst. Atty. Gen.; William Norris and Jacques B. Gelin, Attys., Dept. of Justice, Washington, D. C., on brief), for appellee.

Before CLARK, Associate Justice *, HAYNSWORTH, Chief Judge, and RUSSELL, Circuit Judge.

HAYNSWORTH, Chief Judge:

In a trial before a jury in this condemnation proceeding, a "rebuttal" witness was allowed to range widely in the presentation of new theories for consideration in connection with the land's value. The presentation of the witness was without previous notice to the landowners, who claimed unpreparedness to cross-examine him, and was in violation of a pretrial order. The trial judge finally realized that the witness was ranging far beyond the bounds of rebuttal and instructed the jury to disregard all that the witness had said that was not strictly rebuttal. The fact that the jury's award was the minimum it could have found on the record before it strongly suggests that it was substantially influenced by the improper testimony of the "rebuttal" witness.

Under the circumstances, we think a new trial is required.

## I.

For construction of the Washington subway system, the Washington Metropolitan Area Transit Authority sought to condemn 23.82 acres of land in northern Virginia. The land was zoned for high rise, residential buildings with a density of forty units per acre and commercial use of the ground floors. The taking of the 23.82 acres left the landowners with a residue of 9.5 acres.

Before the trial, the parties exchanged appraisal reports, lists of witnesses, exhibits and other material. A pretrial order required the filing of witness lists at the pretrial conference and provided "no witnesses or exhibits not so listed and filed will be permitted at trial except for impeachment and rebuttal purposes."

At the trial, WMATA offered only one witness in presenting its case in chief. That witness, one Piper, testified that the highest and best use of the land was for the development of an apartment or condominium complex, though he thought that such development should be delayed for two to four years. He offered evidence of several sales which he thought were comparable, on the basis of which he testified that the 23.82 acres taken had a value of $2,100 per apartment unit or a total value of $1,999,000.[1]

The landowners offered two appraisers as witnesses. Each of them agreed with Piper that the highest and best use of the land was for the development of a high rise apartment or condominium complex. One of these witnesses fixed the value of the land on the basis of $3,800 per unit or a total of $3,617,600. The other witness found a unit value of $3,500, but he also thought that the residue had suffered damage to the extent of $300 per potential unit. He fixed the total compensation, including damage to the residue, at $3,446,000.

After the landowners had concluded the presentation of their case, counsel for WMATA called Mr. McCloud Hodges. Although Hodges was a professional appraiser, counsel explained that he was not being called to testify as to the value of the land, but to assist the jury in its understanding of the testimony previously presented. There were references to facts influencing the market, and an explanation of a "dis-

---

* Tom Clark, Associate Justice of the United States Supreme Court (Ret.), sitting by designation.

Mr. Justice Clark participated in the hearing of this case, but died before an opinion had been prepared.

1. The government's initial appraisal was higher. Actually paid into the registry of the court was $2,283,000.

counted cash flow analysis." Counsel for the landowners objected to any testimony by Hodges, but the court stated that it had been assured that Hodges would not undertake to fix any value and was being offered only as a rebuttal witness to explain terms previously used.

Thereupon Hodges proceeded to testify to a number of factors affecting a judgment about the development of a high rise complex for residential use. He discussed interest rates, rising construction costs, increasing costs of maintenance and operation, limitations on the availability of financing and competition from the tax exempt bond market and other factors. More specifically he testified that he had done a "discounted cash flow analysis" of this very land on the basis of alternative development for a rental apartment complex or for high rise condominiums. His conclusion, he testified, was that the land had a negative value for development on either basis, that is, that the land was worthless for that use which all other previous witnesses, including Mr. Piper for WMATA, had testified was the highest and best for the land. Hodges thought the highest and best use of the land was for the construction of townhouses.

Hodges did not testify with precision what value he would assign to the land for the purpose of construction of townhouses, but it is clear that he would have assigned a lower value than any previous witness had assigned to the land for the development of a high rise dwelling complex. Moreover, contrary to the representation that he would not testify as to values, he did testify that the land was worth less than nothing for the use which all previous appraisal witnesses had testified was the best.

The judge instructed the jury that the testimony of Hodges, regarding the best use of the property, had been admitted to rebut the testimony of the landowners' experts that the highest and best use of the property was for the development of a high rise residential complex. He instructed the jury to ignore the balance of Hodges' testimony regarding any factors which, accord-

ing to Hodges, affected the price the land would bring and a decision to construct or not to construct a high rise complex.

Even if the jury had been able to comply with the court's instructions to disregard the major portion of the "rebuttal" testimony, what was left presented them with a major problem. The principal witness for the condemnor agreed with the witnesses for the landowners that the highest and best use of the land was for the development of a high rise residential complex. The only difference between the parties on that score was that Piper, the witness for the condemnor, thought that such a development of the site should not proceed until after the lapse of two to four years, while the witnesses for the landowners seem to have been of the opinion that such development might have proceeded with reasonable promptness after the preparation of the necessary plans and the completion of all the necessary financial and construction arrangements. The difference between the witnesses on the matter of time would influence the assessment of value, and the jury's finding of that may well have influenced the jury to make an award somewhere between the appraisals of Piper on the one hand and those of the witnesses for the landowners on the other. By the court's instructions, however, the jury was invited to consider the testimony of Hodges as a complete rejection of the opinions and appraisals to which the condemnor's witness, Piper, had testified. If they were convinced by Hodges that the land was worthless for the construction of a high rise residential complex, as Hodges testified, and that the highest and best use of the land was for the construction of townhouses, the jury was left with no basis for fixing an award. Seemingly, this was what occurred. The minimum figure mentioned by any witness was Piper's appraisal. Since the jury's award was in precise agreement with that, the probability is that the jury was persuaded by Hodges that the land was actually worth even less than that.

Moreover, that portion of the testimony of Hodges which the jury was invited to

consider clearly went to the question of value. He did not undertake to state a value of the land for the construction of townhouses, but he did state that it was worthless for the development of a high rise complex, and it is obvious that he thought the land was worth much less for townhouses than other land appropriate for development of a high rise complex.

Nor could the jury have been expected to ignore all that Hodges said about his "discounted cash flow analysis" and his discussion of other factors which, he testified, supported his conclusion that the land was worthless for construction of a high rise complex. While the district judge did his best to retrieve the situation after the "rebuttal" witness had ranged far beyond the proper limits of rebuttal, the situation had become irretrievable if the jury was to consider, or did consider, anything of any moment which the witness had said.

The presentation of Hodges was not only a violation of the pretrial order; it was an apparently wholly unanticipated injection into the case of new concepts and new considerations with which counsel for the landowners were unprepared to deal. There was a basis for anticipation of what Piper would say, but they had no basis whatever for anticipation that any witness would contend that the highest and best use of the land was for the construction of townhouses or that anything such as a "discounted cash flow analysis" would lead to a conclusion that the highest and best use of the land was something far different from the highest and best use which the pretrial discovery and pretrial order identified as a matter beyond substantial dispute.

While the trial judge may reasonably have accepted the assurances of counsel that the "rebuttal" witness would not go beyond the proper limits of rebuttal, the situation was out of hand before he realized the extensive violation of the assurances. Since his efforts to retrieve the situation were unavailing, a retrial is necessary.

## II.

We find no merit in the remaining contentions of the landowners. Since there is to be a retrial, however, it is appropriate to notice the landowners' contention that they are entitled to a trial before a commission in accordance with the laws of Virginia.

In the WMATA Compact, Paragraph 82(b), which the parties agree governs procedure rather than jurisdiction, provides that proceedings for the condemnation of property outside of the District of Columbia shall be instituted and maintained pursuant to the provisions of 40 U.S.C. § 257 and 28 U.S.C. §§ 1358 and 1403 "or any other applicable Act." It then provides that if there is "no applicable federal law" the proceedings shall be in accordance with state law governing condemnations by the highway agency of the state. In Virginia, proceedings to condemn land for highway purposes are conducted by a commission.

We find no hiatus in federal law requiring resort to the laws of Virginia. Rule 71A(h) of the Federal Rules of Civil Procedure provides for a trial by jury of the issue of just compensation in condemnation proceedings unless, for good reason, the court orders a trial before a commission of three persons appointed by the court. The rule is not an Act of Congress in the ordinary sense, but it has the force and effect of a statute. It could not have become effective over Congressional objection. It and the other rules proposed by the Supreme Court of the United States and permitted, with or without change, by the Congress to become effective are clearly portions of the body of federal law.

Paragraph 82(b) of the Compact, as other portions of the Compact, evinces a preference for federal law, and state law is made applicable only when no federal law is applicable. The applicability of Rule 71A(h) requires the rejection of the contention of the landowners that, as a matter of absolute right, they were entitled to a trial before a commission in accordance with the laws of Virginia.

Nor, in the circumstances as they appeared to the court at the time, can we find an abuse of the district judge's discre-

tion in declining the request of the landowners for the appointment of a commission. The landowners are people of considerable wealth and prominence, and the land has a value per acre or per square foot well above the experience of most jurors, including most landowners. These circumstances may well have warranted the appointment of a commission and the rejection of the agency's demand for a jury trial, but we cannot say they were so compelling as to make the refusal to appoint a commission an abuse of the discretion lodged in the district judge.

Before the matter is retried, the district court may reconsider the appointment of a commission, for additional circumstances have been injected into the case. There is no longer apparent agreement as to the best use of the land, and the trier of fact will apparently be presented with highly sophisticated, complicated, theoretical economic analyses. We do not direct that the retrial be before a commission, however, for that initial determination should be by the district court, and, in any event, the prospect for the second trial may become considerably altered from all that now appears to us.

*REVERSED AND REMANDED.*